**SO ORDERED.**

**SIGNED this 10 day of June, 2008.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LEO J. SCHWARTZ, | ) | Case No. 03-16197 |
| SHARON J. SCHWARTZ, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| FRONTIER FARM CREDIT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adversary No. 06-5368 |
| | ) | |
| LEO J. SCHWARTZ and | ) | |
| SHARON J. SCHWARTZ, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**

-1-

Frontier Farm Credit (FFC) sues debtors Leo and Sharon Schwartz for their alleged fraudulent omission of Leo's one-sixth remainder interest in certain real estate from their schedules and from their chapter 11 disclosure statement. FFC seeks judgment requiring debtors to sell the undisclosed property interest, for payment into Court for distribution to unsecured creditors the amount of $11,948.72 received by debtors from the sale of a portion of the undisclosed real estate, and for FFC's costs and expenses in investigating and prosecuting this action.[1] The Schwartzes deny that they intended to defraud FFC by their silence and defend their failure to disclose the real estate as a negligent omission. After trial of this matter, the Court is now prepared to rule. Debtors appeared in person and by their attorney J. Michael Morris. FFC appeared by its attorney Eric D. Bruce.

Findings of Fact

On April 18, 1992, Mary Kay Schwartz deeded two quarter-sections of farm ground and three town lots in Hanover, Kansas to her six children, one of whom is debtor and defendant Leo Schwartz. She retained a life estate. Her warranty deed was recorded December 28, 1992.[2] Mary's home was located on the Hanover lots. Leo and his wife, Sharon Schwartz, filed their chapter 11 case on November 12, 2003. They failed to schedule Leo's one-sixth remainder interest in the real estate in the schedules they filed on January 2, 2004 and made no subsequent amendments to those schedules. Nor did they reference the remainder interest in their disclosure statement filed on November 8, 2004. Ultimately, their plan was confirmed on August 15, 2005, again without any reference to the remainder interest. FFC filed its original proof of claim in the amount of

---

[1] Dkt. 26, p. 9.

[2] Ex. 2.

$1,116,293.30. FFC held no lien on the undisclosed real estate or Leo's remainder interest. Mary Schwartz died on October 9, 2005.

After Mary died, FFC learned of the omitted remainder interest held by Leo. On November 9, 2005, FFC filed a "Motion to Require Sale of Assets" in the main bankruptcy case seeking an order requiring that Leo's interest in the land (by now ripened to an undivided one-sixth fee interest) be sold.[3] In responding to this motion, Leo asserted that "on the date of the filing of the bankruptcy, the debtor had no knowledge of the "warranty deed" [from Mary]."[4] He acknowledged that the warranty deed on its face was subject to a life estate in Mary. Leo also denied that he had an "actual interest" in the land and that any interest to which he succeeded as a result of Mary's death was acquired more than 180 days after the filing date and therefore not included in the bankruptcy estate by virtue of § 541(a)(5). Subsequently developed evidence in this matter suggests that Leo's statements in his response were at best incorrect.

On August 17, 2004, well after Leo signed his bankruptcy schedules under oath and only ten weeks before he filed his disclosure statement, Leo and his 5 siblings, along with their mother, sold the Hanover lots with Mary's home for $75,000.[5] Leo and Sharon signed the sales contract as sellers and owners of the lots. Leo also executed the deed as a seller conveying the Hanover lots to the buyers and the settlement statement for the transaction.[6] According to Leo's testimony and that of two of his brothers, Mary wanted her children to have the proceeds of the sale and, accordingly

---

[3] Case No. 03-16197, Dkt. 214.

[4] Case No. 03-16197, Dkt. 217.

[5] Ex. 3.

[6] Ex. 4 and 5.

-3-

directed the title company to make checks to each child for one-sixth of the net proceeds of the sale. Leo received $11,984 that day.[7] Despite being a chapter 11 debtor in possession, Leo did not disclose the receipt of these funds on his August monthly report. In fact, Leo did not file a monthly report for that month. Not until February 16, 2005 did Leo deposit the check and, when he did, he placed these funds in an account at Tier One Bank in Marysville, Kansas, not the debtor-in-possession account.[8]

Thomas Schwartz is Leo's brother and managed some of Mary's affairs. He stated that he was aware of the 1992 deed when Mary made it and that his siblings were, too. [This belies certain comments made by Leo's counsel during the course of these proceedings.] He testified that when Mary decided to sell her home in 2004, she asked him to make the arrangements. He also received cash at the August closing, but stated that all of the siblings decided to wait to cash their checks in case their mother needed the money. Thomas cashed his check when his mother died in October of 2005. According to Thomas, the two quarter sections are farmed by a cousin, Harold Schwartz, and have been since the mid-1990's. Harold pays cash rent to an entity called Schwartz Family Farm Partnership, consisting of Leo and his siblings.[9] Leo received a distribution of $2,012 from this partnership in March of 2007.

Thomas' testimony was corroborated by that of another brother, Larry, except that Larry

---

[7] Ex. 6.

[8] Ex. 11. The closing agent for Washington County Abstract, Janeen Bruna, testified that shortly before the check was deposited, Tier One Bank called her and inquired whether the check was still good because of the age of the dated check.

[9] Thomas testified that the Partnership was formed after Mary died. He indicated that 60% of the rent is paid in January and 40% of the rent is paid in June or July. In 2006 and 2007, the rent totaled about $14,000 each year.

-4-

denied being aware of the deed when it was given in 1992. He says he became aware of the 1992 deed in 2000 when his mother became ill. Like Leo and Thomas, Larry received his share of the proceeds from the sale of Mary's home place and held onto it for some period of time.

With regard to the 1992 deed, Leo did not recall seeing it before his mother died in 2005 but when pressed, he admitted that he knew about it, to the extent that he knew that his mother had a life estate in the land and was in sole possession of the land. He claimed that he "did not own" the real estate interest. He stated that he listed everything they "physically owned." As to why he omitted the remainder from his schedules, Leo stated that "we reported what we have," meaning what he held in his possession. He did not think this land had anything to do with the case. Leo also stated that he thought he had no ownership interest in the land until his mother died and therefore did not schedule the real estate interest on his bankruptcy filing.

With respect to the sale of Mary's house in Hanover in August of 2004, Leo admitted that he was one of the sellers of this property. He denied receiving the sale proceeds check on August 17, 2004 but could not specifically recall when he did receive it other than that he received it before Mary's death in 2005. Leo stated that when Mary directed the money to him and his siblings, he was surprised. He did state that he deposited the check at Tier One Bank in Marysville in February 2005 to keep it separate from his own holdings. As noted above, Leo testified that he did not report the funds because he felt they had nothing to do with the bankruptcy. He also excused this omission by stating that he does not do the paperwork for his business.

Co-debtor Sharon Schwartz testified that she first learned of the existence of the 1992 deed in August of 2004 when the homestead was sold. On cross-examination, she changed her testimony to indicate that she was unaware of the 1992 deed until after Leo's mother died. She stated that she

-5-

was at the closing, but did not see Leo's check delivered to him. Closing agent Janeen Bruna of the Washington County Abstract Company testified that she delivered the check to Leo at the closing. Sharon conceded that she was aware of the deed and the check by the time they filed their disclosure statement in November of 2004 but did not disclose them. Sharon also conceded that she neither reported the deed nor the check to the Court in any fashion. She also admitted that even when the check was deposited in February of 2005, it was not mentioned on the monthly reports.[10] Nothing in the record reflects the degree and extent to which Sharon was involved in the preparation of the schedules and statement of affairs. Nor was there any evidence that Sharon wittingly participated in the decision to include or omit the remainder interest.

FFC's only witness was its in-house appraiser, Ray Shinn.[11] He described his calculations and methodology in arriving at a value for the debtors' one-sixth undivided interest in the two quarters on August 15, 2005, the date of confirmation.[12] Shinn gave no testimony whatever concerning FFC's reliance on what the Schwartz schedules disclosed, nor did he comment in any respect on FFC's approach to the bankruptcy case, debtors' chapter 11 plan, or the underlying debt. He testified that the two quarters had a gross value of $339,700, but that he discounted that value back to $264,000 because of the existence of Mary's life estate in 2005.[13] He concluded that Leo's

---

[10] Sharon testified that the Tier One Bank account remains open today and the $11,984 sale proceeds remain in this account.

[11] No other FFC representative, executive, or lending officer familiar with the Schwartz credit testified at trial although a FFC executive attended the trial.

[12] Ex. 8.

[13] Ex. 8, Supplement to Exhibit 8, pp. 1-4.

-6-

share of the remainder interest in the land had a value of one-sixth of $264,000 or $44,000.[14] Shinn further discounted Leo's interest by fifteen percent for the partial undivided ownership interest to arrive at a final value for Leo's one-sixth remainder interest of $37,400.[15]

The Schwartzes' plan is a joint plan, filed with their wholly-owned entity, Pork Chop Acres, L.L.C. Pork Chop is the Schwartz's hog farm operation. Their plan contemplated a transfer to Schwartz Family Farms, LLC (SFF) of "all of the assets of Pork Chop Acres, Inc. and all non-exempt assets of the debtors Leo and Sharon Schwartz." The plan included a lengthy treatment of FFC's various secured claims and provided for the balance of FFC's claims to be treated as unsecured. Unsecured creditors were to receive a pro rata distribution of an amount equal to 50 per cent of the net profit of SFF from January 1, 2005 until December 31, 2007. FFC hotly contested the confirmation of debtors' plan, but an agreed resolution of the treatment of its claims is embodied in the Order on Confirmation entered on August 15, 2005.

Procedural Background

FFC filed this adversary proceeding on August 14, 2006, but this is only the latest of FFC's efforts to seek redress for Leo's failure to disclose the transferred land. Some discussion of FFC's course of action in this matter is necessary to place its complaint and the Court's ruling in legal context.

FFC first filed a motion in the main case on November 9, 2005, some three months after

---

[14] *Id.*

[15] *Id.* Shinn's value was premised on the assumption that the interest could be partitioned and that his 15% undivided ownership discount encompassed the costs of partition. On cross-examination, Shinn wavered on whether the $37,400 value would be lower if the interest could not be partitioned.

-7-

confirmation and well-within the 180 days allotted to revoke a chapter 11 confirmation order under 11 U.S.C. § 1144,[16] seeking an order from the Court requiring debtor to sell his undisclosed interest in the land ("the Sale Motion").[17] FFC cited no legal authority for the Court to compel debtor to sell the land. Debtors objected to the motion, contending that debtors' plan discharged debtors from this claim pursuant to the order confirming plan and § 1141(d)(1)(A).[18] In their objection, debtors represented that they had no knowledge of the existence of the warranty deed on the date of the petition. The Sale Motion was set over to a scheduling conference on March 16, 2006 and an evidentiary hearing on June 14, 2006.

At the scheduling conference the Court inquired of FFC's counsel whether it was seeking to revoke confirmation. FFC's counsel stated that "[i]f that's the only remedy we have then certainly that's the remedy we're seeking to pursue."[19] At the close of the scheduling conference the Court advised counsel that it would proceed with an evidentiary hearing, treating the Sale Motion as one for the sale of assets, as pled by FFC. The Court specifically advised counsel that he would need to amend his Sale Motion if FFC was pursuing some other remedy.[20] The Court notes here, as it has in prior rulings in this matter, that an action to revoke a chapter 11 confirmation

---

[16] The bankruptcy case in which this adversary proceeding is filed was commenced prior to October 17, 2005. Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. §101, et seq. as it was in force prior to that date.

[17] Case No. 03-16197, Dkt. 214.

[18] Case No. 03-16197, Dkt. 217.

[19] Case No. 03-16197, Dkt. 251, Tr., p.2, l. 24-25.

[20] *Id.* at p. 4, l. 2-8.

-8-

order must be filed as an adversary proceeding.[21]

FFC did not amend its Sale Motion nor did it file a complaint for revocation of confirmation. The Court attempted to clarify what cause of action FFC was pursuing at the opening of the evidentiary hearing in this exchange with counsel for FFC:

> THE COURT: You're not asserting that the confirmation of this plan should be revoked for fraud are you?
> MS. CARSON: No Your Honor, but we are saying that the Court retains jurisdiction to order the Debtor to either sell this property or modify the plan to address the value of this property in some way.[22]

After receipt of documentary evidence only and hearing oral arguments from counsel, the record was closed and the Court took the matter under advisement.[23] While the matter was under advisement, FFC filed an unsolicited supplemental brief, to which the debtors responded, and a reply.[24] In its supplemental brief, and in direct contradiction of its counsel's statement at the hearing, FFC demanded revocation of confirmation or discharge for fraud.[25] This is the first reference to such a request made by FFC in a pleading.

On July 31, 2006, the Court issued an order denying the Sale Motion.[26] In that order, the

---

[21] *See* Fed. R. Bankr. P. 7001(5).

[22] Case No. 03-16197, Dkt. 252, p. 3, l. 19-23.

[23] FFC presented no oral testimony of witnesses at the "evidentiary hearing."

[24] Case No. 03-16197, Dkt. 235, 236 and 240.

[25] Case No. 03-16197, Dkt. 235 ("This supplemental brief is filed to clarify the intent of the creditor to pursue revocation of confirmation or revocation of discharge as to the value of the property for the purpose of being allowed to seek sale of the property in a state court proceeding.") FFC filed its Supplemental Brief, Dkt. 235, on June 21, 2006, well after 180 days after the date of entry of the confirmation order, August 15, 2005.

[26] Case No. 03-16197, Dkt. 241.

Court stated that there was no legal authority that would authorize it to order a sale of the property after entry of confirmation. The Court further concluded that FFC's subsequent request to revoke confirmation under § 1144, made in its supplemental brief and filed long after 180 days after the confirmation order's entry, was not timely, nor was it properly invoked.[27]

FFC then commenced this adversary proceeding. In its initial complaint, FFC sought to revoke the debtors' discharge for fraud, not under § 1144, but instead under §§ 727(d)(1) and (d)(2). Debtors moved to dismiss the first complaint for failure to state a claim upon which relief could be granted, arguing the obvious point that § 727 does not apply to a Chapter 11 case and that the complaint for revocation of confirmation under § 1144 was untimely brought.[28] In its response, FFC conceded the obvious, that its revocation action was untimely, but now asserted that it could maintain an independent action for fraud for nondisclosure of assets, based upon its allegedly new discovery that debtor had participated in the sale of Mary's homestead on August 17, 2004 (receiving $11,948.72 of the sale proceeds), part of the property in which debtor purportedly unwittingly held a remainder interest.[29] Abandoning its revocation claim, FFC now asserted that a money judgment remedy was appropriate, even though it had not requested that remedy in the complaint. On February 13, 2007, the Court entered an order dismissing the complaint as to revocation, but granting leave to FFC to amend its complaint to plead with more particularity an

---

[27] *See* 11 U.S.C. § 1144 (requiring revocation proceeding to be instituted within 180 days of the confirmation order); Fed. R. Bankr. P. 7001(5) and 9024(3) (requiring revocation proceeding to be brought by adversary complaint, not by motion)

[28] Dkt. 5. The order of confirmation was entered August 15, 2005 and the adversary complaint was filed nearly one year later on August 14, 2006.

[29] Dkt. 8.

-10-

independent action for fraud and its prayer for relief.[30] FCC filed its amended complaint to assert its independent fraud action on February 22, 2007.[31]

The Court conducted a trial on this fraud claim on January 22, 2008 and after receiving post-trial submissions from the parties, the case was taken under advisement.[32]

Analysis

The Court is disheartened, disappointed, and frustrated by this case – disheartened by Leo Schwartz's lack of candor in both his filings and his testimony, disappointed by FFC's failure to identify and timely and effectively pursue its appropriate remedy, and frustrated by the lack of an appropriate means of redress, largely as a result of FFC's handling of this matter.

Leo Schwartz's lack of candor cuts to the heart of the bankruptcy process. Debtor candor is essential to the orderly operation of the system.[33] This Court categorically condemns the conduct of a debtor who (1) fails to schedule a remainder interest of substantial value; (2) sells part of that interest during a chapter 11 case without seeking this Court's approval as is required by § 363; (3) conceals the proceeds of that sale by failing to include them in his Rule 2015 reports; (4) conceals

---

[30] Dkt. 10.

[31] Dkt. 12.

[32] The parties stipulated to some facts in the final pretrial order. *See* Dkt. 26. Post-trial briefing was completed on March 17, 2008. *See* Dkt. 42, 44, and 45.

[33] *See In re Lewis,* 309 B.R. 597, 602-03 (Bankr. N.D. Okla. 2004) ( . . . this case exposes the fragility of the bankruptcy system. Ours is a system build upon the principle of full and candid disclosure. Debtors must truthfully and accurately list all of their assets and all of their liabilities. . . . It is these disclosures which allow the public to have confidence in the system, and hopefully to believe that bankruptcy laws exists to protect the "honest but unfortunate" debtor . . .); *In re Superior Crewboats, Inc.*, 274 F.3d 330, 335 (5th Cir. 2004) (The Bankruptcy Code and Rules impose upon bankruptcy debtors an express, affirmative duty to disclose all assets, including contingent and unliquidated claims; the duty is continuous.)

-11-

both the land and the sale transaction by failing to refer to either of them in his disclosure statement; and (5) misleads the Court with less than candid statements in his pleadings.

However, also essential to the cause of justice in bankruptcy is the timely pursuit by an aggrieved creditor of its rights. In all respects, FFC failed woefully. This Court cannot excuse FFC's failure to bring a properly and timely filed action for revocation of Schwartz's confirmation, the most effective, if not the only remedy for the debtor's wrongdoing.

Because FFC missed the revocation boat, this controversy now centers on whether the debtors defrauded FFC under Kansas law by their series of omissions in this case.[34] This is a far more difficult case to make. To prove debtors' fraud by silence, FFC must show by clear and convincing evidence[35] that: (1) debtors had knowledge of the remainder interest that FFC did not

---

[34] As noted in the procedural background, FFC's failure to timely pursue revocation of confirmation under § 1144 is inexplicable given its discovery of the omitted real estate during the 180-day period. *See In re Orange Tree Associates, Ltd.*, 961 F.2d 1445, 1447 (9th Cir. 1992) (Revocation of confirmed plan is barred, even where the creditor does not discover the fraud until after the 180-day period has expired); *In re Newport Harbor Associates*, 589 F.2d 20, 24 (1st Cir. 1978) (180-day limitations period begins to run from the date of the order of confirmation, not from the date of the discovery of the fraud); *In re California Litfunding, a Nevada Corp.*, 360 B.R. 310 (Bankr. C.D. Cal. 2007) (The court has no power to extend time within which motion to revoke confirmation of chapter 11 plan may be made.). This left FFC with only an independent action for fraud to seek redress from debtors' omissions. *See In re Newport Harbor Assoc., supra; In re Emmer Bros. Co.*, 52 B.R. 385 (D. Minn. 1985); *In re Coffee Cupboard, Inc.*, 119 B.R. 14, 19 (E.D. N.Y. 1990); *In re Circle K Corp.*, 181 B.R. 457, 461-62 (Bankr. D. Ariz. 1995); *In re California Litfunding, a Nevada Corp., supra* at 318 (Discussing factors to determine whether action is truly an independent cause of action and not subject to 180-day limit for revocation).

[35] The Court applies the clear and convincing evidence standard here because FFC's claim is an independent damages action for fraud, not revocation. Because this is not an action pursuant to § 1144, the Court does not decide what the appropriate burden of proof would be under the revocation statute. *See Tenn-Fla Partners v. First Union Nat. Bank of Florida*, 229 B.R. 720, 729 (W.D. Tenn. 1999) (applying a preponderance of the evidence standard for § 1144), *aff'd* 226 F.3d 746 (6th Cir. 2000).

-12-

have and which FFC could not have discovered by the exercise of reasonable diligence; (2) debtors were obligated to communicate that interest to the Court and creditors; (3) debtors intentionally failed to disclose the interest; (4) FFC justifiably relied on debtors to disclose the remainder interest; and (5) FFC sustained damages as a result of debtors' nondisclosure.[36] As discussed below, the fourth and fifth elements of FFC's claim of fraud by silence are problematic given the evidentiary record before the Court.

The Court is satisfied that Leo knew he had a remainder interest in the land and intentionally failed to disclose it in his bankruptcy. His testimony that it was "not involved in the bankruptcy" suggests that his nondisclosure was the result of conscious thought. Leo operated a sophisticated farm operation and owned plenty of land. He was well-counseled. In this Court's experience, it is the rare Kansas farmer who cannot identify every square foot of his ground–his most treasured means of production. There is no excuse for not disclosing the asset.[37] While it cannot be said that FFC could not have discovered this remainder – a title search would doubtless have revealed it – it is not FFC's duty to "fish" for assets; it is Leo's duty under § 521 to fully disclose his assets. Putting Leo's story in its best light, he may have been unaware of the actual terms of the *1992 deed*

---

[36] *Miller v. Sloan, Listrom, Eisenbarth, Sloan and Glassman*, 267 Kan. 245, 260, 978 P.2d 922 (1999) (Doctor sued his medical malpractice attorneys for fraud for their failure to inform the doctor of the settlement hearing on the medical malpractice claim against him.).

[37] *See In re Ford*, 492 F.3d 1148 (10th Cir. 2007) (Debtor was denied exemption in undisclosed personal injury settlement on basis of bad faith; court rejected debtor's contention that she failed to disclose her personal injury award because she believed it exempt under state law and believed she was only required to list claims against *her*, not claims she asserted against others.); *In re Calder*, 93 B.R. 734 (Bankr. D. Utah 1988), *aff'd* 907 F.2d 953 (10th Cir. 1990) (Debtor failed to disclose ownership interest in mineral rights; if debtor is uncertain as to whether certain assets are legally required to be included in his petition, it is his duty to disclose assets so that question may be resolved.).

-13-

conveying the partial remainder interest to him and his siblings at the time it was made. But, he *was* aware of his mother's life estate in the property long before his bankruptcy and long before her death. He knew he would come into possession of the land when his mother died. Having signed an agreement to sell the Hanover lots and home in 2004 (as one of the sellers and owners), Leo could no longer claim ignorance or excuse. He was obligated to amend his schedules and disclose the asset. As stated by one bankruptcy court:

> [D]ebtors have the absolute duty to report whatever interests they hold [ ], even if they believe their assets are worthless or unavailable to the bankruptcy estate. This is because the bankruptcy court, not the debtor, decides what [asset] is exempt from the bankruptcy estate.[38]

The Court is mindful that a party's nondisclosure does not constitute fraud absent a duty on the party to speak or disclose information.[39] Constructive fraud is a concealment of facts which the party is under a legal or equitable duty to communicate; neither actual dishonesty of purpose nor intent to deceive is necessary.[40] Here, as a debtor in bankruptcy, Leo was absolutely obligated to disclose the existence of the remainder interest under 11 U.S.C. § 521 and Fed. R. Bankr. P. 1007. He was required to disclose the sale of the land and his receipt of the proceeds under 11 U.S.C. § 541.[41] He was also obligated to report his receipt of the proceeds as part of the debtor in possession accounting.

Leo intentionally failed to communicate either the existence of the asset or its sale. He

---

[38] *In re Robinson*, 292 B.R. 599, 607 (Bankr. S.D. Ohio 2003).

[39] *OMI Holdings, Inc. v. Howell*, 260 Kan. 305, 343, 918 P.2d 1274 (1996).

[40] *Moore v. State Bank of Burden,* 240 Kan. 382, 389, 729 P.2d 1205 (1986), *cert denied* 482 U.S. 906 (1987).

[41] *See* 11 U.S.C. § 363 and Fed. R. Bankr. P. 6004

-14-

pointedly stated that he did not deem this property part of the bankruptcy case. He did not include a reference to the proceeds in the appropriate monthly reports.[42] He was at best evasive in his response to FFC's initial demand to have the property sold.[43] In that response, Leo represented that: " . . . [he] had no knowledge of the existence of the "warranty deed." Further, [he] had no equitable interest in the property which is the subject of the "warranty deed." . . . [he] did not have such interest as of the date of the filing of the bankruptcy and whatever interest the debtor now has is not property of the estate . . ."[44] What Leo failed to state, however, is that he knew his mother occupied the property as the life tenant at the time he filed his bankruptcy. Even more compelling, Leo failed to disclose that he had participated in the sale of a portion of the property in 2004, one year prior to confirmation and FFC's Sale Motion, and that he received some of the sale proceeds from the property and was holding them in an account other than the DIP account. Leo's rationalization for not disclosing the remainder interest is not credible. The Court concludes that FFC has demonstrated the first three elements of its constructive fraud claim by clear and convincing evidence.

The Court is not convinced that FFC has proven the fourth element – justifiable reliance – on this record. Notwithstanding the presence at trial of an FFC executive lending officer, FFC introduced no evidence whatever of FFC's approach to the case. The Court may assume that FFC relied to some degree on Leo's schedules or his silence with respect to this property, but the Court may also assume that where a million-dollar farm credit is involved, the Farm Credit System, like

---

[42] *See* Fed. R. Bankr. P. 2015(a) and 4002

[43] No. 03-16197, Dkt. 217.

[44] *Id.* at ¶ 5.

-15-

any other responsible commercial lender, does substantial continuing investigation concerning its borrowers' assets. FFC presented no evidence or testimony about what it might have done differently had it known of Leo's remainder interest and the existence of this real estate.[45] Would FFC have opposed the plan? Would FFC not have agreed to the stipulated treatment of its claim? Would FFC have negotiated differently? Given the fact that FFC discovered the omitted property shortly after confirmation but did not timely seek to revoke the order of confirmation, FFC is hard-pressed to demonstrate its reliance on the debtors' omissions. Nor does the structure of the plan really relate to what Leo had in the estate; instead what FFC will receive on account of its unsecured claim relates to what Leo will generate in profit during the three plan years. The existence of this property had only a minor impact on the generation of income to fund the distribution to the pool of unsecured creditors.[46]

Likewise, clear and convincing evidence of how FFC was damaged by this omission is lacking. FFC had no lien in this real estate and its "take" under the plan is based solely on income generated by the debtor. FFC has provided no legal authority that would support this Court compelling the sale of what is now Leo's undivided one-sixth ownership interest in the two quarter sections of real estate. Moreover, debtors have shown enough to cast substantial doubt on whether the liquidation of the remainder interest, even if valued at $37,400 as FFC contends, would be sufficient to cover the administrative expenses. Thus, there is no reasonable certainty that, even if

---

[45] *Cf. York v. Intrust Bank, N.A.,* 265 Kan. 271, 295-97, 962 P.2d 405 (1998) (Purchaser of lot relied upon purchase contract that did not disclose build-job commission where purchaser testified that he would have purchased a lot elsewhere had he known he would have to pay a commission on a build job.).

[46] As noted in the facts, Leo did not farm these two quarter sections, his cousin did.

liquidated, the proceeds of sale would find their way into the pool of funds for distribution to unsecured creditors.[47]

As noted above, this Court is frustrated by FFC's failure to pursue the revocation remedy it had at its disposal. This is not a case where a creditor discovered the omission too late to obtain relief under the Bankruptcy Code. Relief under § 1144 might well have been available had FFC timely and efficiently presented that case. Instead, despite having been aware of the omitted information since November of 2005, FFC took two years to correctly articulate its claim, invoke the proper procedure to assert it, and bring it to trial. Even when given its day in court, FFC did not present evidence on two elements of its fraud claim.

The Court is equally troubled by the Leo Schwartz's conduct. Leo Schwartz's willful nondisclosure of the remainder interest and the sale during the pendency of his chapter 11, however he may rationalize it, cannot be ignored. Not even after the omission was brought to Schwartz's attention did he act to rectify it. He was not forthright concerning the sale of a portion of the real estate even though it occurred just weeks prior to filing his disclosure statement and plan. He did not promptly seek to modify his confirmed plan or otherwise offer to remedy his omission.[48] This is conduct that strikes at the heart of the integrity of the bankruptcy system and which, had it been

---

[47] FFC raises a constructive trust theory in its post-trial brief. This relief or theory was not presented by FFC in the final pretrial order and the Court declines to address it here.

[48] *See In re Coastline Care, Inc.*, 299 B.R. 373, 379 (Bankr. E.D. N.C. 2003) (confirmed plan of reorganization may be modified by reorganized debtor under § 1127(b) until it has been substantially consummated, but not thereafter); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 398 (Bankr. E. D. Pa. 2001) (Modification of a confirmed chapter 11 plan is precluded once plan has been substantially consummated.). *See also* 11 U.S.C. § 1101(2) defining "substantial consummation." Here, the three year period in which the reorganized debtor was to pay a percentage of its profit to unsecured creditors ended in 2007.

-17-

timely brought to the Court's attention in the proper manner, might have resulted in significant sanctions being assessed against Leo Schwartz. But, as noted above, it was not.

In summary, based upon this record, FFC has failed to prove by clear and convincing evidence that debtors committed fraud by their nondisclosure of the remainder interest from their chapter 11 bankruptcy. The Court has no recourse but to grant judgment in favor of debtors on FFC's amended complaint. A judgment on decision will issue this day.[49]

# # #

---

[49] To the extent that the Schwartzes have shared in the collected rents by virtue of their association with Schwartz Family Farms Partnership, those rent shares, along with any other net profits received by them, should be included in the net profit calculation of the reorganized entity, Schwartz Family Farms, LLC, to the extent the Schwartzes benefitted from them from January 1, 2005 to December 31, 2007. Whether that has occurred is not before this Court today.